Dissenting opinion filed by Circuit Judge PLAGER.
DYK, Circuit Judge.
Ms. Karen Graviss petitions for review of an arbitrator’s decision denying the Federal Education Association-Stateside Region’s (“FEA”) grievance of her removal for “inappropriate physical contact with a student.” The arbitrator held that FEA failed to show that Ms. Graviss’s due process rights wére violated and that the Department of Defense and Domestic Dependent Elementary and Secondary Schools (“DDESS”) had proved by a preponderance of the evidence that the removal penalty both promoted the efficiency of the service and was reasonable. We hold that Ms. Graviss’s due process rights were violated by an improper ex parte communication between a supervisor and the deciding *1363 official. Accordingly, we reverse and remand. ,
BackgRound
Ms. Graviss has worked in. the education field since 1978, primarily serving as a teacher to young special needs children. Ms. Graviss started as a pre-school teacher for a rehabilitation center and eventually transitioned to work as a second-grade teaching assistant and regular education teacher. From 1994 to 2008, Ms. Graviss worked in the Fort Knox Educational Development Intervention Services Program at Ireland Army Hospital. In 2008, DDESS hired Ms. Graviss as a pre-school teacher for special needs children at King-solver Elementary, part of Fort Knox Schools, where she worked until her removal on June 16, 2010. At Kingsolver Elerhentary, Ms. Graviss taught three- and four-year-old children with disabilities such as autism.
The events precipitating Ms. Graviss’s removal are recounted in detail in the arbitrator’s decision. See J.A. 804-90. For purposes of this appeal, we provide only a brief summary. Special education teachers must make difficult judgment calls in determining how to handle the behavior of their special needs students. This case has its genesis in divergent approaches to that problem.
On January 22, 2010, Dr. Andrea McClain, Kingsolver Elementary’s principal and Ms. Graviss’s direct supervisor, issued Ms. Graviss a letter of reprimand based on an “inappropriate interaction with a student” and “failure to follow directives.” J.A. 691. Specifically, the letter stated that, on January 16, 2010, Ms. Gra-viss and her aide had physically carried— “under his arms” and “under his knees”— a misbehaving general education preschool student who “wouldn’t come to [the principal’s] office” on his own. Id, The letter also stated that Ms. Graviss had emailed concerns to Dennis Labriola, the director ■ of special education, when Dr. McClain had previously directed Ms. Gra-viss to “bring all issues directly to [her] attention as the building principal.” Id. FEA filed a grievance concerning the letter.
Thereafter, on March 22, 2010, one of Ms. Graviss’s students had an episode, which manifested in his repeatedly flailing his arms, kicking, and screaming. While the other students were out at recess, Ms. Graviss employed two, methods of physical restraint on the child in an attempt to subdue .him. First, Ms. Graviss sat the child in a bean bag chair next to a wall and rolled the chair over itself toward the wall with the student inside. Second, after another outburst approximately three hours later, Ms. Graviss sat the child in a chair, pressed into the back of the chair with her knee, and pulled on the child’s crossed arrns from behind. Ms. Graviss does not appear to materially dispute the factual record of the events described, but contends that such methods of restraint were not improper. Two of Ms. Graviss’s classroom aides who were present at the time later reported the incidents via email to Dr. McClain. Dr. McClain then conducted an interview with Ms. Graviss in the presence of an FEA representative. After the interview, Dr. McClain completed and submitted a Family Advocacy Program Department of Defense Education Activity (“DoDEA”) Serious Incident Report and Alleged Child Abuse Report to the Family Advocacy Program, which operates like Child Protective Services for the military and investigates institutional child abuse.
On March 26, 2010, Dr. McClain forwarded the Serious Incident Report via email to her direct supervisor, Community Superintendent John Todd Curkendall, who would later serve as the deciding official in Ms. Graviss’s removal proceedings, *1364 and his supervisor, District Superintendent Dr. Frank Calvano. In response to this email, District Superintendent Dr. Calvano replied to both Dr. McClain and Mr. Curkendall (“the March 26 email”), stating, “I think this is going to come back with a ruling of no fowl [sic].[1] Regardless, we need to try and terminate her for repeated use of corporeal [sic] punishment and for insubordination.... ” J.A. 630 (emphasis added). Dr. McClain quickly replied to both Dr. Calvano and Mr. Curken-dall, stating, “Luckily, we have the two witnesses. I strongly support termination. This would match the DoDEA 1435.1 reg for a second offense of insubordination and the one on causing bodily harm. The second offenses on those both say suspension or removal.” Id.
On April 12, 2010, Dr. McClain issued a notice of proposed removal for Ms. Gra-viss. J.A. 708-09. The notice alleged a single charge of “inappropriate physical contact with a student” based on the instances of physical restraint discussed above. The notice did not charge Ms. Graviss with either of the more serious charges of corporal punishment or insubordination' discussed by Dr. Calvano in the March 26 email. Id. The notice informed Ms. Graviss that she could reply both in writing and orally to Mr. Curkendall, who would serve as the deciding official. J.A. 709. Ms. Gra-viss, represented by FEA as her union representative, responded both in writing and orally to Mr. Curkendall. Neither Ms. Graviss nor FEA was informed at the time about the March 26 email correspondence between Dr. McClain, Dr. Calvano, and Mr. Curkendall.
On June 14, 2010, after considering Ms. Graviss’s submitted replies, Mr. Curken-dall issued a formal written decision concluding that “the proposed removal and the charge of inappropriate physical contact with a student are fully supported by a preponderance of the evidence.... [The removal] is reasonable and promotes the efficiency of the service.” J.A. 797. Ms. Graviss was removed from her position effective June 16,2010.
FEA filed a grievance challenging Ms. Graviss’s removal on September 9, 2010. DDESS denied the grievance, and FEA invoked arbitration. During discovery proceedings leading up to the arbitration, Ms. Graviss learned for the first time about the March 26 email when DDESS produced a copy in discovery. The arbitrator then held a hearing on October 22 and 23, 2014, at which he heard testimony from many witnesses, including Mr. Curkendall and Dr. Calvano. Mr. Curkendall testified that, although he considered “everything relative to this case” in making his decision, his direct supervisor Dr. Calvano “did not direct him how to rule in this matter” in the March 26 email. J.A. 826. Mr. Curkendall further testified that he had issued recent disciplinary decisions contrary to Dr. Cal-vano’s views—including, in this case, imposing lesser punishment than Dr. Calvano had suggested. See J.A. 861.
Dr. Calvano similarly testified that he “never issued a directive or an order on how Mr. Curkendall should rule on a case,” including with respect to Ms. Gra-viss. J.A. 827. Dr. Calvano further testified that “I’m responsible for everything and sometimes I make direct decisions and give direct orders and sometimes I opine on matters with respect to sharing my views with proposing officials or deciding officials.... ■ Sometimes folks agree with me and sometimes they don’t.” J.A. 861. *1365 Dr. Calvano explained that typically, when he does “opine on proposed discipline,” he communicates his opinion to Nancy Gilley, the labor relations specialist. J.A. 827-28. He testified that “I typically, if you will, am overridden by Nancy Gilley.... She and I oftentimes agree; sometimes we don’t.” J.A. 828. On cross-examination, it became apparent that Nancy Gilley, unlike Mr. Curkendall, does not report to Dr. Calvano. See J.A. 861-62.
In his final written decision, the arbitrator rejected Ms. Graviss’s first due process argument that the March 26 email should have been disclosed to her at an earlier stage of the proceedings. The arbitrator held that the argument “lacks logic” because even if the March 26 email had been disclosed at an earlier stage, the disclosure would not have eliminated the alleged bias. J.A. 868. The arbitrator also rejected Ms. Graviss’s due process argument that the March 26 email constituted an improper ex parte communication under Stone v. Federal Deposit Insurance Corp., 179 F.3d 1368 (Fed. Cir. 1999). The arbitrator explained, “[i]f Calvano’s email was intended to be influential on the proposing or deciding official it was wholly ineffective. Were those officials influenced by the email they would have had ample opportunity and ability to modify the charges, to rewrite the unwritten, as yet, Notice of Proposed Removal, which they did not do.” J.A. 863. The arbitrator then held, without any detailed analysis of the three Stone factors discussed below, that “unlike in Stone, the Calvano statement contains no ‘new and material information.’” Id. The arbitrator found that the evidence “do[es] not show Curkendall was not the decider in this matter. The full record shows Curkendall was the independent decider required under case law.” J.A. 864.[2]
Ms. Graviss petitions for review in our court. We have jurisdiction under 28 U.S.C. § 1296(a)(9); see also 6 U.S.C. §§ 7121(b)(2)(B), 7703(b)(1). In reviewing the arbitration award, we apply the same standard that is applied to appeals from the Merit Systems Protection Board (“Board”). 5 U.S.C. § 7121(f); Young v. Dep’t of Hous. & Urban Dev., 706 F.3d 1372, 1375 (Fed. Cir. 2013). Under that standard, we must affirm the arbitrator’s decision unless it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); Young, 706 F.3d at 1375-76. “In addition, we must reverse an arbitrator’s decision if it is not in accordance with the requirements of the Due Process Clause of the Fifth Amendment or any other constitutional provision.” Young, 706 F.3d at 1376 (citing Ward v. U.S. Postal Serv., 634 F.3d 1274, 1278 (Fed. Cir. 2011)).
Discussion
Public employees like Ms. Graviss possess a constitutionally protected property right in their continued employment. See, e.g., Arnett v. Kennedy, 416 U.S. 134, 155, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Stone, 179 F.3d at 1374. In Cleveland Board of Education v. Loudermill, the *1366 Supreme Court held that pre-deprivation due process is required in public employee discharge cases, stating,
[w]e have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee.
470 U.S. 582, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (internal quotation marks, footnote, and citations omitted). “[W]here a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, ... the defect divests the removal ... of legality.... In that situation, the merits of the adverse action are wholly disregarded.” Sullivan v. Dep’t of Navy, 720 F.2d 1266, 1274 (Fed. Cir. 1983) (quoting Ryder v. United States, 585 F.2d 482, 487-88 (Ct. Cl. 1978)).
Our decision in Stone v. Federal Deposit Insurance Corp. sets forth the constitutional due process requirements that apply to cases such as this involving ex parte communications to the deciding official. 179 F.3d at 1376. In fact, Stone involved nearly identical circumstances to those of this case, as the government largely concedes. Mr. Stone was removed from his federal position, and he appealed to the Board. Id. at 1372. During the discovery process, Mr,. Stone learned for the first time that the deciding official had received an ex parte memorandum from the proposing official and another ex parte memorandum from a third government employee, both urging that Mr. Stone be removed. Id. at 1372-73. In an affidavit, the deciding official stated that he would have concluded that Mr. Stone should be removed “whether or not he had seen” the ex parte memorandum from the proposing official. Id. at 1373. The Board denied Mr. Stone’s appeal, and he petitioned for review in our court. Id.
We held that “[t]he introduction of new and material information by means of ex parte communications to the deciding official undermines the public employee’s constitutional due process guarantee of notice (both of the charges and of the employer’s evidence) and the opportunity to respond.” Id. at 1376. Accordingly, it is “constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process.” Id. We went on to explain, however, that “not every ex parte communication is a procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee and entitles the claimant to an entirely new administrative proceeding.” Id. at 1376-77. Rather, only ex parte communications that “introduce new and material information to the deciding official” contravene due process. Id. at 1377. The key, therefore, is determining whether the ex parte communication contained “new and material information.”
We articulated three relevant factors: whether (1) “the ex parte communication merely introduces ‘cumulative’ information or new information”; (2) “the employee knew of the error and had a chance to respond to it”; and (3) the communications were “of the type likely to result in undue pressure upon the deciding official to rule in a particular manner.” Id. Ultimately, the inquiry is “whether the ex parte communication is so' substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.” Id. Finally, we made clear that, if new and material information has been conveyed by the ex parte communication, “then a due process violation has occurred and the former employee is entitled to a new constitutionally correct removal procedure. ... [W]hen a procedural due process *1367 violation has occurred because of ex parte communications, such a violation is not subject to the harmless error test.” Id. at 1377. Accordingly, we reversed and remanded for the Board to consider the above factors and make a determination as to whether the ex parte communications introduced new and material information such that Mr. Stone’s due process rights had been violated. Id.. Similarly, in Sullivan we held that “improper ex parte communications were not only unfair, but also denied petitioner his rights under the due process clause of the Constitution” and “further that they tainted the investigation, voided the entire proceeding, and rendered [the] removal decision a nullity.” 720 F.2d at 1274.
Before the arbitrator here, Ms. Graviss argued that Stone required a finding that her due process rights had been violated. See J.A. 940, The arbitrator did not undertake any detailed analysis of the Stone factors, but instead summarily concluded that, “unlike in Stone, the Calvano statement contains no ‘new and material information,’ ” J.A. 863. Substantial evidence, therefore, does not support the arbitrator’s decision in this respect. Even a brief examination of the Stone factors reveals that Ms. Graviss’s due process rights were violated by the March 26 email.
The government first argues that the Stone factors do not apply at all here because the communication' occurred before removal proceedings had been brought against Ms. Graviss. The government contends that improper ex parte communications can only occur once the removal proceeding had actually begun— in this case, when the notice of proposed removal had been issued. To be sure, as we discuss below, not all ex parte communications before the initiation of a proceeding will violate due process. But we see no basis for a distinction between pre- and post-initiation communications when the ex parte communication occurred at a time, as is the case here, when an adjudicatory proceeding was contemplated. The risk of creating undue pressure in such circumstances is just as great when ex parte contact occurs before the proceeding begins as when it occurs after the proceeding begins.
Here, it is clear that a proceeding was contemplated; indeed, that was the very purpose of the email, and it does not matter for the purposes of constitutional due process whether the ex parte communication occurred before or after formal proceedings had been initiated. Notably, under the Administrative Procedure Act, ex parte communications in the formal adjudication context are prohibited when “the person responsible for the communication has knowledge [the proceeding] will be noticed.” 5 U.S.C. § 557(d)(1)(E).[3] The Board itself follows this rule. See 5 C.F.R. § 1201.102 (prohibiting ex parte communications “from the time the persons. involved know that the Board may consider the matter until the time the Board has issued a final decision”). Accordingly, we proceed to consider the Stone factors.
The first Stone factor is whether the ex parte communication “introduces ‘cumulative’ information or new information.” Stone, 179 F.3d at 1377. While the government echoes the arbitrator’s conclusion that “the email ... was not ‘new and material evidence,’ ” it does not argue that the *1368 March 26 email was merely “ ‘cumulative’ information” under the first factor. Br. of Appellee at 24. Nor could it. The March 26 email clearly introduced new information to Mr. Curkendall, the deciding official, because it informed him for the first time that his supervisor, Dr. Calvano, wanted Ms. Graviss to be removed for “insubordination” and “repeated use of corpor[a]l punishment.” J.A. 630. That information, along with Dr. McClain’s ready agreement, was not “cumulative” of any other information received by Mr. Curkendall. The first Stone factor was satisfied.
As to the second factor, whether “the employee knew of the error and had a chance to respond to it,” Stone, 179 F.3d at 1377, the government does not dispute that Ms. Graviss only learned about the March 26 email during discovery leading up to arbitration, long after her opportunity to respond to the proposed termination had closed, the termination decision was made, and she was removed from her position. Accordingly, the second Stone factor was satisfied.
The dissent concedes that “[undoubtedly, it would have been preferable had the issue been fully aired at the initial stages of the administrative review, for whatever relevance to the merits' it may have had.” Dissent at 1374. But the dissent suggests that any unfairness resulting from Ms. Graviss’s lack of knowledge of the March 26 email prior to her termination was mitigated later when she was given the opportunity to address the email during arbitration. See id. .That opportunity to address the email occurred four years after her termination when the email was finally disclosed.
It is true that, as the Supreme Court recognized in Loudermill, there are “some situations in which a post-deprivation hearing will satisfy due process requirements.” 470 U.S. at 542 n.7,105 S.Ct. 1487 (emphasis added): But this does not mean that an employee enjoys no due process before removal. Our recognition of the importance of pretermination due process dates back at least to our holding in Stone. See 179 F.3d at 1376 (“An employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, the employee is entitled to relief regardless of the stage of the proceedings.”); see also Ward, 634 F.3d at 1282 (“If the Board finds that the communications did introduce new and material information in violation of [Petitioner’s] due process rights, [Petitioner] must be afforded a constitutionally correct removal procedure.” (internal quotation marks omitted)). Recently, this court has squarely rejected the idea that an adequate post-termination review can cure a procedurally deficient termination proceeding. See Young, 706 F.3d at 1377 (“[Petitioner] was entitled to procedural fairness at each stage of the removal proceedings, not just upon review of the termination decision.” (internal quotation marks omitted)).
As to the third factor, whether the communications were “of the type likely to result in undue pressure upon the deciding official to rule in a particular manner,” id. Ms. Graviss argues that the March 26 email from a supervisor to a subordinate deciding official is a paradigmatic example of “the type” of communication “likely to result in undue pressure.” The government disagrees on this point, contending that “Dr. Calvano’s informal opinions are just that: informal opinions. They do not direct, officially recommend, or even pressure an outcome.” Br. of Appellees at 29-30. The government emphasizes the arbitrator’s finding that the decision-maker here was subjectively independent, arguing that such subjective independence forecloses any due process violation.
It is true, as the government contends, that the arbitrator concluded that the “full *1369 record shows Curkendall was the independent decider required under case ■ law,” J.A. 864, based on the testimony from Mr. Curkendall and Dr. Calvano that no undue influence had been intended or perceived. And it is true that no such finding had been made in Stone, where we remanded to the MSPB for a consideration of the three factors in the first instance. Stone, 179 F.3d at 1377. But whether or not the decisionmaker was subjectively independent is not the question. Rather, the fundamental issue is whether there was a substantial potential for undue pressure using the objective standard of Stone. .
The third Stone factor, whether the communications were “of the type likely to result in undue pressure upon the deciding official to rule in a particular manner,” Stone, 179 F.3d at 1377 (emphasis added), specifically directs the inquiry to the “type” of communication involved, and does not require proof that the ex parte communication actually resulted in undue pressure upon the deciding official to rule in a particular , manner. Indeed, we held in Stone that “[ultimately, the inquiry .... is whether the ex parte communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.” Id. (emphasis added). While proof of subjective undue influence from an undisclosed communication may support a conclusion that there has been a due process violation, the absence of subjective influence does not foreclose the possibility of a violation. See Ward, 634 F.3d at 1280 n.2. Accordingly, the arbitrator’s finding that Mr. Curken-dall in fact believed that he was not unduly influenced by the March 26 email does not preclude a due process violation. We con-elude that a petitioner need not prove actual subjective influence in order to demonstrate a violation of due process under Stone. See also Camero v. United States, 376 F.2d 777, 780 (Ct. Cl. 1967) (invalidating removal despite concluding that the deciding official “made up his own mind when he decided to sustain plaintiffs removal” because “decisions were made, at least in part, on the basis of the ex parte communication”).
Here, the March 26 email was certainly the “type” of communication “likely to result in undue pressure on the deciding official to rule in a particular manner” under the objective framework of the third Stone factor. Stone, 179 F.3d at 1377 (emphasis added). A supervisor issued what can only most generously be deemed a “suggestion” to a subordinate decision-maker. The nature of this communication, particularly in light of the strong language used, “we need to try and terminate her ...,” and the specificity of the suggested rationale, “for repeated use of corporeal [sic] punishment and for insubordination,” J.A. 630 (emphasis added), creates a high risk that a subordinate decision-maker would have been unduly pressured to terminate the employee. Because the undisclosed March 26 email was of the type likely to result in undue pressure, the third Stone factor was satisfied.
To be clear, we are not suggesting .that the standards of impartiality applicable to the judiciary and to Board adjudication also apply in the context of an agency decision to remove an employee or other adverse action.[4] Inevitably, due to the nature of the workplace, a deciding official in the employment context likely is familiar with the employee and has knowledge of *1370 the employee’s prior performance and conduct. Contrary to the dissent’s suggestion, we recognize that the. existence of such knowledge by officials involved with the removal process (including the deciding official) creates no due process issue, as we held in Norris v. SEC, 675 F.3d 1349 (Fed. Cir. 2012). In Norris, we affirmed an arbitrator’s finding that an alleged ex parte communication was not new and material where the alleged ex parte communication was merely the deciding, official’s awareness of a prior incident of the employee’s misconduct at the time of her removal decision. See id. at 1353-54. As we explained, “a deciding official’s mere knowledge of prior misconduct by the employee obtained before the commencement of disciplinary proceedings does not constitute an improper ex parte communication.” Id.
But unlike Norris, this case does not involve routine communications and knowledge acquired about an employee’s job performance before a decision to commence removal proceedings. Rather, the communication in this case was directed to the conduct of the removal proceedings and is indistinguishable from the type of communication that this court recognized violated due process in Stone. All three of the Stone factors are satisfied. First, the communication was made in contemplation of removal proceedings and provided the new information that the official’s supervisor wanted Ms. Graviss to be terminated. Second, Ms. Graviss was unaware of this communication and, therefore, she had no opportunity to respond to it. Third, the recommendation of termination by the deciding official’s supervisor was “of the type likely to result in undue pressure upon the deciding official to rule in a particular manner,” in this case, to terminate Ms. Graviss. Stone, 179 F.3d at 1377.
We conclude that Ms. Graviss’s due process. rights were violated, and that substantial evidence does not support the arbitrator’s conclusion to the contrary. We need not consider Ms. Graviss’s other arguments regarding the merits of her removal. We reverse and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED
Costs
Costs to petitioners.

. By “no fo[u]l,” it appears that Dr. Calvano was referencing the Family Advocacy Program investigation, which was separate from Ms. Graviss’s removal proceedings and followed from Dr. McClain’s mandatory submission of Serious Incident and Child Abuse reports. See J.A. 366.

. The arbitrator also concluded that "[e]ven if, arguably, [the March 26 email] was ‘material relied on in proposing removal’ the alleged failure to immediately provide to [Ms. Graviss] was harmless error as [Ms. Graviss] had the information at the hearing, and opportunity to challenge and address it and did so.” J.A. 889. As the government concedes, the arbitrator's invocation of a harmless error test here was erroneous. As discussed below, in Stone we held that “when a procedural due process violation has occurred because of ex parte communications, such a violation is not subject to the harmless error test.” 179 F.3d at 1377.

. Id. § '557(d)(1)(A), (E) (prohibiting "an ex parte communication relevant to the merits of the proceeding” and providing that “the prohibitions of this subsection shall apply beginning at such time as the agency may designate, but in no case shall they begin to apply later than the time, at which a proceeding is noticed for hearing unless the person responsible for the communication has knowledge that it will be noticed, in which case the prohibitions shall apply beginning at the time of his acquisition of such knowledge”).

. Other circuits have rejected such arguments where an impartial decision maker presides over post-termination proceedings. See, e.g., McDaniels v. Flick, 59 F.3d 446, 459-60 (3d Cir. 1995) (collecting cases); Walker v. City of Berkeley, 951 F.2d 182, 184 (9th Cir. 1991); Duchesne v. Williams, 849 F.2d 1004, 1005, 1008 (6th Cir. 1988) (enbanc).